## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON

**PENNY S. WEBB,**
 **Plaintiff,**

**v.**                                        **CIVIL ACTION NO. 2:15-cv-11209**

**CAROLYN. W. COLVIN,**
**Acting Commissioner of Social Security,**
 **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. § 401-433. Presently pending before this Court are Plaintiff's Memorandum in Support of Judgment on the Pleadings (ECF No. 8) and Brief in Support of Defendant's Decision (ECF No. 9).

Claimant Penny S. Webb, filed an application for DIB on September 27, 2011. Claimant alleged disability beginning January 9, 2009. These claims were denied initially on December 2, 2011, and upon reconsideration on December 22, 2011. Thereafter, Claimant filed a written request for hearing on January 13, 2012. A hearing was held in front of an Administrative Law Judge (ALJ) in Charleston, West Virginia, on May 17, 2013. By decision dated January 30, 2014, the ALJ determined that Claimant was not entitled to benefits. On March 24, 2014, Claimant sought review by the Appeals Council of the ALJ's unfavorable decision. In a notice dated May 21, 2015, the Appeals Council (AC) denied Claimant's request for review. The ALJ's decision became the final decision of the Commissioner. Thereafter, Claimant filed the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g), and

1

requesting remand of the Commissioner's decision.

Standard of Review

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520 (2015). If an individual is found "not disabled" at any step, further inquiry is unnecessary. *Id.* § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. *Id.* § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. *Id.* If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(e). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. *Hall v. Harris,* 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2015). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education,

work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date of January 9, 2009, and meets the insured status requirements of the Social Security Act through March 31, 2012 (Tr. at 14). Under the second inquiry, the ALJ found that Claimant suffers from the severe impairment of degenerative joint disease of the thoracic spine, post-operative residuals of a right shoulder injury, residuals of a neck injury, depression, anxiety/panic attacks and borderline intellectual functioning. (*Id.*)  At the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled the level of severity of any listing in Appendix 1 (Tr. at 16 ). The ALJ then found that Claimant has a residual functional capacity to perform a full work at the light exertional level[1] (Tr. at 27). The ALJ held that Claimant could perform unskilled work in the national economy in jobs such as: bagger, marker and electrode cleaner (Tr. at 27). On this basis, benefits were denied (Tr. at 27-28).

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In *Blalock v. Richardson*, substantial evidence was defined as:

> Evidence which a reasoning mind would accept as sufficient to

---

[1] Claimant can occasionally lift and carry up to 20 pounds.  She could frequently lift and carry up to 10 pounds.  She could stand and walk at least 6 hours as well as sit up to 6 hours in an 8 hour work day.  She could occasionally climb ramps and stairs.  She could never climb ladders, ropes or scaffolds.  She could occasionally balance, stoop, kneel, crouch and crawl.  She could perform no overhead reaching with the right (dominant) extremity.  She could have only occasional exposure to extreme cold, wetness, humidity, vibrations or hazards.  She could understand, remember and carry out simple tasks.  She could respond appropriately to brief encounters with coworkers and supervisors but should have no interaction with the general public.  She would do best in an environment requiring minimal interaction and few, if any, changes in the work routine (Tr. at 19).

> support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner in this case is not supported by substantial evidence.

## Claimant's Background

Claimant was born on June 8, 1959.  She has a high school education (ECF No. 8).

## Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the ALJ failed to provide an adequate explanation for her residual functional capacity (RFC) finding (ECF No. 8).  Claimant argues that the ALJ's credibility determination is not supported by substantial evidence.  Additionally, Claimant asserts that the ALJ erred in failing to account for Claimant's moderate difficulties in concentration, persistence or pace, which the ALJ found to exist.  Defendant avers that Claimant has not proven she is disabled under the Social Security Act (ECF No. 9).  Defendant asserts that the ALJ adequately discussed Claimant's RFC determination and that substantial evidence supports the ALJ's credibility analysis.  Lastly, Defendant assets that the ALJ adequately accounted for Claimant's concentration, persistence and pace.

<u>Medical Record</u>

The Court adopts the medical record findings asserted by Claimant and by Defendant, regarding Claimant's right shoulder, to the extent as follows (ECF Nos. 8 and 9):

Claimant injured her right shoulder in January 2009 (Tr. at 569).  Claimant began chiropractic treatment at Calfree Chriopractic on January 12, 2009 (Tr. at 527).  On January 24, 2009, Claimant underwent an MRI of the right shoulder which showed a small joint effusion. (*Id.*) There were findings suggestive of supraspinatus tendinopathy with peritendinitis with fluid in the subacromial bursa. (*Id.*)

On February 3, 2009, Claimant underwent an X-ray of the right shoulder which showed marked narrowing of the subacromial space and mild right glenohumeral arthrosis.  On June 29, 2009, Claimant was examined by Dr. James Cox.  He diagnosed a right shoulder sprain with persistent anterior rotator cuff and bicipital tendinitis versus a small anterior or superior labrum tear.  Dr. Cox injected Claimant's right shoulder and recommended a follow-up appointment in two to three weeks.

On September 3, 2009, Claimant underwent arthroscopic debridement of a partial SLAP lesion, debridement of a partial thickness rotator cuff tear and a subacromial decompression, performed by Dr. Cox.  Claimant began physical therapy at Generations Physical Therapy on September 9, 2009.  Claimant was examined on Dr. Cox on October 12, 2009.  Claimant reported having the same amount of pain as before the surgery.  Dr. Cox instructed Claimant to continue physical therapy.  Dr. Cox injected her shoulder and prescribed Norco. (*Id.*)

On November 2, 2009, Claimant underwent an IME with Dr. P. Mukkamala.  Dr. Mukkamala stated the claimant had not reached maximum medical improvement.  On November 23, 2009, Dr. Cox examined Claimant.  She was progressing with range of motion but still

experienced pain.  Dr. Cox recommended a functional capacity evaluation followed by work hardening.

On January 13, 2010, Claimant was examined by Christopher Santangelo, PA-C for Dr. Cox.  Claimant complained of right shoulder pain.  Mr. Santangelo advised Claimant to keep moving her shoulder so it would not freeze.  Claimant stated she always moved her shoulder at home and demonstrated this by putting her right upper extremity through full range of motion without any pain.  Authorization was requested for Prednisone.  Claimant was released to return to work with no restrictions on January 18, 2010.  Claimant was advised to follow-up in four to six weeks and this would end her course of treatment.

Claimant reported to Paul Machwitt, M.D., an orthopedic surgeon, on March 31, 2010 (Tr. at 526-545).  Claimant reported that she had not returned to work as a cashier.  Claimant complained of shoulder pain.  Claimant stated that she tries to use her right arm but it hurts.  She stated that she can bathe and dress herself but she needs help fastening her bra. (*Id.*)  Claimant reported that she does not do any household chores due to shoulder pain.  X-rays were taken on March 31, 2010.  External rotation view of the injured right shoulder shows asteophyte inferior to the acromion, which would impinge on the rotator cuff.  Dr. Machwitt reported "I think this is a significant problem." (*Id.*)  Dr. Machwitt stated "I think she needs an MRI and she probably needs re-scoping of the right shoulder.  She will not be at maximum medical improvement until this determination has been made" (Tr. at 531).

Claimant began shoulder treatment with James B. Cox, D.O., an orthopedic surgeon, in June 2009 (Tr. at 272, 553-54, 608-09).  In Dr. Cox's initial examination, Claimant had full range of motion of her shoulder with pain above 90 degrees (Tr. at 554, 608-09).  An MRI scan showed degenerative changes at the acromioclavicular AC joint (Tr. at 553).  She had mildly positive

6

impingement signs and minimal tenderness over the AC joint (Tr. at 554).  Her drop arm test was negative.   Dr. Cox diagnosed her with a right shoulder sprain with tendinitis with possible labrum tear, and administered a cortisone shot (Tr. 554, 609).   Dr. Cox's plan stated "She may be a candidate for a diagnostic arthroscopy of her right shoulder to evaluate and possibly treat for a labrum tear" (Tr. at 554).   Claimant reported that she needed assistance with housework, but otherwise was "completely able" to perform activities of daily living, such as maintaining personal care, dressing, preparing meals, and shopping (Tr. at 605).

Claimant returned to Dr. Cox in July and September 2009, complaining of continued right shoulder pain despite physical therapy (Tr. 272, 556).  Claimant retained full range of motion with pain at about 90 degrees, mildly positive impingement tests, tenderness over the AC joint, negative drop arm test, and "fairly good strength." (*Id.*)  An MRI showed degenerative changes of the AV join, mild tendinopathy of the rotator cuff, but no evidence of a tear (Tr. at 272). Dr. Cox determined that he would perform a diagnostic and surgical shoulder arthroscopy (Tr. at 272-273, 556).

Dr. Cox performed surgery on Claimant's right shoulder in early September 2009 without complications (Tr. at 276).  Her post-operative diagnosis was a right shoulder sprain with partial SLAP lesions, partial thickness rotator cuff tear, and subacromial bursitis.  Claimant then attended 35 physical therapy sessions from September 9, 2009 until November 20, 2009 (Tr. at 418).

On November 20, 2009, at physical therapy Claimant reported that her "pain is less than prior to surgery, but it is still present in the same areas with certain movements of the arm" (Tr. at 311).  Claimant reported that the pain is at its worst when she is "reaching out to the side, across her body and behind her back." (*Id.*)  She reported that her mobility of her right arm had improved and that she could "move it anyway you want me to, but pain is there."  She stated that she

experiences anterior shoulder pain when she attempts to pull her pants up.  She stated that she is able to lift a 10 pound bag of potatoes, but with pain. (*Id.*)  "Treatment during this course of care has consisted of cryotherapy, education, electric stimulation, home exercises, soft tissue mobilization, therapeutic exercises, ultrasound with HCTZ medium and ultrasound with lidocaine medium."

In November 2009, she reported being able to move her shoulder "anyway you want me to, but pain is there" (Tr. at 311).  A functional capacity evaluation in December 2009 determined that Claimant should be re-evaluated after work conditioning/hardening therapy (Tr. at 359).  Claimant, however, told her therapist that she refused this treatment, stating she had "improved as much as she is going to" and said she "has no intention of doing the work hardening program as she never had to work 8 hours for her job.  She would like to try to return to work for her husband at their convenience store, possibly when the weather gets better" (Tr. at 299, 418).  In her last physical therapy session in January 2010, her range of motion had improved, with flexion of 135 degrees and abduction of 130 degrees (Tr. at 299).  Her right shoulder strength was either 4+/5 or 5/5 in all movements. (*Id.*)

Claimant was also evaluated by Dr. Cox on January 13, 2010 (Tr. at 555).  Treatment notes state that Claimant "has actually retained quite a bit of range of motion" but she still reports "that anytime she uses her arm she has pain." (*Id.*)  Dr. Cox reported that Claimant was "fighting against me" as he "was externally rotating her shoulder" and that Claimant complained of pain while he was rotating her shoulder.  Claimant was released to return to work. (*Id.*)

In February 2010, Dr. Cox indicated that it was possible Claimant's partial thickness supraspinatus tear had progressed to a full thickness tear instead of healing since the surgery (Tr. at 558).  Also, Claimant's primary care provider, Becky Dempsey, FNP, BC, examined

Claimant and found that her right arm showed normal range of motion with and no pain (Tr. at 1120). On February 22, 2010, Claimant returned to Dr. Cox and reported that "she still is able to use her shoulder, move it in all directions but she has pain" (Tr. at 558). Claimant reported that she had not returned to work because "she does not feel she is ready from the standpoint of her shoulder." (*Id.*) Dr. Cox's plan stated:

> My only other thought at this point is perhaps her partial thickness supraspinatus tear has gone on to a full thickness tear instead of progressive healing after surgery. This would certainly explain her persistent symptoms and if she does have a full thickness tear, that would require surgical repair. That I believe would improve her ultimate outcome."

On March 31, 2010, Paul Bachwitt, M.D. performed an Independent Medical Examination ("IME") for Claimant's work injury claim and reported that Claimant had not reached maximum medical improvement and that "[h]er right shoulder motion is quite poor and her pain is significant. There is an osteophyte seen on x-rays taken today which should not be present." (Tr. 530). Dr. Bachwitt further explained that the osteophyte would impinge on Claimant's rotator cuff, and if present at that time, should have been addressed by Dr. Cox when he performed Claimant's 2009 right shoulder surgery (Tr. at 528).

On April 7, 2010, an MRI of Claimant's right shoulder performed at Thomas Memorial Hospital reported the following impressions:

> There appears to be a small full-thickness tear of the supraspinatus tendon, a tear of the supraspinatus tendon.
>
> There is a tear of the infraspinatus, which does not appear to extend through the entire width of the tendon, but there is fluid dissecting into the muscle.
>
> There is a slight hooked appearance of the acromion, which may encroach on the rotator cuff.

Notched appearance of the anterior glenoid labrum may be post-surgical. Clinical correlation is suggested (Tr. at 564-565)..

An MRI of April 26, 2010 confirmed a small full thickness tear of the supraspinatus tendon in addition to a tear of the infraspinatus tendon with fluid dissecting into the muscle and a slightly hooked appearance of the acromion that possibly encroached on the rotator cuff (Tr. at 564-565).

Louis E. Bolano, M.D., with Three Gables Surgery Center, performed surgery on Claimant's right shoulder on August 6, 2010 (at 1087- 1093). Five days after the surgery, Claimant began physical therapy, which she continued for approximately six months (Tr. at 860-988). In the fall of 2010, physical therapy progress reports showed that Claimant continued to improve and was "feeling much better" but complained of intermittent pain in her right shoulder (Tr. at 866). Her flexion was 125 degrees, and her abduction was 110 degrees. Her right shoulder strength was 4/5 flexion, 4-/5 abduction, 4+/5 external rotation, and 5/5 internal rotation (Tr. at 874). Also in the fall of 2010, Dr. Bolano noted that Claimant was "doing OK" and was "doing well at therapy" (Tr. at 634). He found that she maintained full strength, and her range of motion limitations were within the range of expected post- operative restrictions (Tr. at 887).

On December 8, 2010, Prasadaro Mukkamala, M.D., performed a consultative examination (Tr. at 768). Claimant reported she was able to carry out her activities of daily living "very well" (Tr. at 771). Her range of motion was 130 degrees on flexion and abduction (Tr. at 778). Dr. Mukkamala concluded that Claimant reached the maximum degree of medical improvement, did not require any treatment, and she could simply proceed with a home exercise program (Tr. at 780-781).

A physical therapy progress note dated December 8, 2010, reflects that Claimant

"reports 'I can do anything with my arm, but it hurts.'  She contintues to [complain of] intermittent pain at the superolateral shoulder, right upper trapezius and right parascapulars" (Tr. at 972).

On January 31, 2011 and February 3, 2011, Claimant was evaluated by a physical therapist at Dr. Bolano's request (Tr. at 848, 963-64).  Her range of motion was 115-to-138 degrees on flexion, and 100-to-120 degrees on abduction (Tr. at 848).  Her strength was 4/5 in her right arm. Claimant was able to perform elevated/overhead work tasks with her hands at crown/head level for almost two minutes (Tr. at 849, 856).  In addition, Claimant exhibited non-organic behaviors, such as bending the waist instead of her right shoulder during manual muscle testing of shoulder flexion at 90 degrees, frequent unsolicited voicing of pain, sighing/moaning, and tearfulness (Tr. at 849).

Similarly, in a February 7, 2011 functional capacity evaluation (FCE), Claimant made a "submaximal effort," and the test results were deemed invalid (Tr. at 815).  She did not express a need to work, and complained of high pain but declined emergency room services (Tr. at 818). The examiner was "unable to determine claimant's true functional abilities."  The examiner concluded "[t]ests reflects what she is willing to give us on this day and on this day she is only willing to give us sedentary physical demand level" (Tr. at 817).

Dr. Bolano ordered an MRI of Claimant's right shoulder which was performed on February 11, 2011 (Tr. at 1018).  The MRI impressions were: The supraspinatus appears thinned with increased signal, but grossly intact.; There is some mild increased signal seen in the subscapularis and infraspinatus tendons.  This may represent some mild tendinopathy.; and, Ovoid fluid collection is identified in the subacromial subdeltoid burs.a (Tr. at 1018-1019).

On February 17, 2011, Dr. Bolano found a mildly positive impingement test, but negative Hawkin's test and negative labral click test (Tr. at 991, 1037). An MRI showed that her right rotator cuff repair was intact with only mild tendinopathy, and she had no motor or sensory deficits in her right arm (Tr. at 991-92, 1018).

On April 18, 2011, Claimant had her last visit with Dr. Bolano (Tr. at 989). Her impingement test, Hawkin's sign, and labral click test were all negative. She maintained full strength in her shoulder and almost full range of motion with painful overhead motion. Four months later, a general physical examination showed no range of motion deficits, no abnormalities in her upper extremities, and no muscle weakness (Tr. at 1183).

On October 26, 2011, Rabah Boukhemis, M.D., a state agency physician, completed a physical RFC assessment (Tr. at 1320-1327). He opined that Claimant could lift 20 pounds occasionally, 10 pounds frequently, and could stand, sit, or walk for six hours in an eight-hour workday (Tr. at 1321). He found that Claimant's reach was limited, and she could perform only occasional overhead exercise (Tr. at 1322).

On February 2013, a full physical examination at Thomas Memorial Hospital's Emergency Department showed normal range of motion in Claimant's extremities (Tr. at 1354). On June 19, 2013, Nilima Bhirud, M.D., performed a consultative examination (Tr. at 1464). Claimant reported that she still had a "lot of problems" with her right shoulder, and also complained about neck and back pain (Tr. at 1464-1465). Dr. Bhirud completed a range of motion chart, indicating that Claimant's shoulder flexion was limited to 50 degrees flexion and 45 degrees abduction on the right (Tr. at 1468). She completed a check-box form, wherein she indicated that Claimant could continuously lift 10 pounds, and frequently lift up to 20 pounds (Tr. at 1470). She also checked boxes to indicate that Claimant could never reach overhead nor in all other directions

with her right arm (Tr. at 1472).

Nilima Bhirud, M.D., the consultative examiner evaluated Claimant at the request of the ALJ in June 2013 (Tr. at 1464-1469). While the ALJ discussed Dr. Bhirud's opinions to the extent that Claimant was capable of performing light work but could never perform postural motions, the ALJ failed to discuss Dr. Bhirud's clinical findings and opinions that were specific to Claimant's shoulder impairment, which Claimant had alleged to be her primary disabling impairment (Tr. at 23, 25). Dr. Bhirud's report included range-of-motion testing that confirmed Claimant had significant limitations in her ability to reach in all directions with her right upper extremity:

        A. Flexion (0° - 180°)          Right 50°

        B. Abduction (0°-180°)       Right 45°

        C. Adduction (0° - 50°)       Right 30°

        D. Internal Rotation (0° - 40°)    Right 25°

        E. External Rotation (0° - 90°)    Right 60°

(Tr. at 1468). Dr. Bhirud indicated that Claimant put forth "good" effort on her range-of-motion testing (Tr. at 1469). Additionally, Dr. Bhirud completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) form and stated Claimant should never reach overhead or in all other directions with her right upper extremity (Tr. at 1472).

## Testimony

Claimant testified she was right-hand dominant and had constant pain in her right shoulder and down her right shoulder blade (Tr. at 48). She indicated she could not raise her arm above her head and had difficulty sleeping. Claimant explained her first surgery left her with more pain than before, and a second surgeon performed another procedure that did provide some

relief but did not resolve her pain (Tr. at 48-49).  She stated that her fingers would become numb if performing tasks for longer than 15 or 20 minutes and that she could only reach to about her shoulder level (Tr. at 49). Claimant testified she could lift a five-to-ten bag of potatoes with her right arm but would need the assistance of her left arm for support (Tr. at 52).

<u>RFC</u>

A RFC represents the most that an individual can do despite his or her limitations or restrictions. *See* Social Security Ruling 96-8p, 1996 WL 374184, *1 (July 2, 1996). Pursuant to SSR 96-8p, the RFC assessment must be based on all of the relevant evidence in the case record, including the effects of treatment and the limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication. *Id.* at *5. The Ruling requires that the ALJ conduct a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. This function-by-function analysis enables the ALJ to determine whether a claimant is capable of performing past relevant work, the appropriate exertional level for the claimant, and whether the claimant is "capable of doing the full range of work contemplated by the exertional level." *Id.*

Looking at all the relevant evidence, the ALJ must consider the claimant=s ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. '404.1545(a) (2014). AThis assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s). *Id.* In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments. *Ostronski v. Chater*, 94 F.3d 413, 418 (8th Cir. 1996).  In

making this assessment, the ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations.[2]" *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015) (quoting Social Security Ruling 96-8p, 61 Fed. Reg. 34,474, 34, 475 (July 2, 1996).  Only after such a function-by-function analysis may an ALJ express RFC "in terms of the exertional levels of work." *Id.* (quoting SSR 96-8p, 61 Fed. Reg. at 34,475).

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. The ALJ also must "explain how any material inconsistencies or ambiguities, in the evidence in the case record were considered and resolved." *Id.*

In *Mascio*, the Fourth Circuit observed that SSR 96-8p "explains how adjudicators should assess residual functional capacity. The Ruling instructs that the residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." It is only after the function-by-function analysis has been completed that RFC may "be expressed in terms of the exertional levels of work." *Id.* The Court noted that the ruling must include a narrative as to how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. *Id.* The Fourth Circuit further noted that a *per se* rule requiring function-by-function analysis was inappropriate "given that remand would prove futile in cases

---

[2]  The listed functions include:  the claimant's (1) physical abilities, "such as sitting, standing, walking, lifting, carrying, pushing, pulling or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching)"; (2) mental abilities, "such as limitations in understanding, remembering and carrying out instructions and in responding appropriately to supervision, coworkers and work pressures in a work setting"; and (3) other work-related abilities affected by impairments "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses and impairment(s) which impose environmental restrictions." See 20 C.F.R. § 416.945(b)-(d).

where the ALJ does not discuss functions that are 'irrelevant or uncontested." *Id.* Rather, the Fourth

Circuit adopted the Second Circuit's approach that "remand may be appropriate...where an ALJ

fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence

in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review."

*Id* (*Citing Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)); *see also*, *Ashby v. Colvin*,

Civil Action No. 2:14-674 (S.D. W.Va. Mar. 31, 2015).

<u>Discussion</u>

The ALJ found that Claimant has the RFC to perform light work, however, the ALJ stated

"the claimant's ability to perform all or substantially all of the requirements of this level of work

was impeded by additional limitations" (Tr. at 27). The limitations included "no overhead

reaching with the right (dominant) extremity" (Tr. at 19). The RFC did not limit her ability to

reach in all directions.

Claimant asserts:

> In determining that Webb's right shoulder impairment limited her
> ability to reach overhead but not her ability to reach in all directions,
> the ALJ briefly considered the findings of Nilima Bhirud, M.D., the
> consultative examiner who evaluated Webb at the request of the
> ALJ in June 2013 (Tr. 1464-1469). While the ALJ discussed Dr.
> Bhirud's opinions to the extent that Webb was capable of
> performing light work but could never perform postural motions,
> the ALJ failed to discuss Dr. Bhirud's clinical findings and opinions
> that were specific to Webb's shoulder impairment, which Webb
> had alleged to be her primary disabling impairment (Tr. 23, 25).
> In fact, the ALJ compared Dr. Bhirud's findings to those of a
> December 2010 worker's compensation physician, which she had
> characterized as "modest abnormal findings" (Tr. 23). In actuality,
> Dr. Bhirud's report included range-of-motion testing that
> confirmed Webb had *significant* limitations in her ability to reach
> in all directions with her right upper extremity:
>
> A. Flexion (0° - 180°)                    Right 50°
> B. Abduction (0°-180°)                   Right 45°

16

    C.  Adduction (0° - 50°)            Right 30°
    D.  Internal Rotation (0° - 40°)       Right 25°
    E.  External Rotation (0° - 90°)     Right 60°

(Tr. 1468). Dr. Bhirud indicated Webb put forth "good" effort on her range-of-motion testing (Tr. 1469). Webb's inability to raise her right arm above her waist to the front or to the side, as indicated by range-of-motion restrictions of 50° flexion and 45° abduction respectively, were hardly representative of "modest abnormal findings" or "normal objective findings" (Tr. 23). Moreover, Dr. Bhirud completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) form and stated Webb should never reach overhead or in all other directions with her right upper extremity (Tr. 1472). While the ALJ adopted the limitation that Webb could never reach overhead with her right upper extremity, she failed to explain why she rejected the additional limitation that Webb could never reach in all other directions with her right upper extremity. Instead, the ALJ opted to give "significant weight" to the 2011 opinions of non- examining medical reviewers, which were provided more than a year prior to Webb's date last insured and without the benefit of Dr. Bhirud's consultative examination findings and additional medical evidence from 2012 and 2013 that subsequently were included in the record (Tr. 25, referring to Tr. 1320-1329, 1330).

       The ALJ failed to provide an adequate explanation for how she formed her RFC conclusions, especially in relation to Webb's severe right shoulder impairment. This failure frustrates meaningful review by this Court and leaves the Court unable to determine whether the ALJ properly considered Webb's right shoulder impairment when formulating her RFC and in posing her hypothetical question to the VE (ECF No. 8).

In response, Defendant asserts:

       The ALJ included a number of restrictions in the RFC relating to Plaintiff's shoulder condition – including limiting Plaintiff to lifting no more than 20 pounds occasionally and 10 pounds frequently, no climbing ladders, ropes, or scaffolds, and no overhead reaching with her right hand (Tr. 19). Plaintiff argues that the ALJ should have provided a more extensive discussion of why her RFC did not include a restriction in reaching in all directions, in addition to the overhead reaching restriction (Pl. Br. at 7-9). In particular, Plaintiff argues that the ALJ should have further discussed Dr. Bhirud's findings regarding Plaintiff's range of motion in her right shoulder of 50 degrees flexion and 45 degrees abduction (Pl. Br. at 9-10).

Plaintiff's argument lacks merit, because the ALJ sufficiently discussed the evidence about Plaintiff's range of motion in her shoulder, as well as Dr. Bhirud's opinion, to permit meaningful review of the ALJ's RFC analysis.

\*\*\*

Here, the ALJ did not ignore Dr. Bhirud's opinion, nor the relevant evidence about Plaintiff's ability move her right arm. The ALJ acknowledged that Dr. Bhirud found that Plaintiff had right shoulder motion restrictions, and specifically stated that Dr. Bhirud identified several limitations that were not supported by the record, to which the ALJ afforded little weight (Tr. 23, 25). Although the ALJ identified only one example of Dr. Bhirud's limitations unsupported by the record, which related to stooping, it is clear from the decision on the whole that this was only one example, and the ALJ also found that Dr. Bhirud's right shoulder motion restrictions were not supported by the record (Tr. 23, 25). Indeed, the ALJ specifically referenced Dr. Bhirud's right-shoulder motion restrictions, stated that "several" of Dr. Bhirud's restrictions were not supported by the record, and then included overhead reaching restrictions, but not other reaching restrictions, in the RFC (Tr. 23, 25). Moreover, the ALJ specifically discussed the evidence that contradicted Dr. Bhirud's finding, which the ALJ relied upon. Furthermore, Plaintiff's own testimony contradicted Dr. Bhirud's range of motion findings (Tr. 20, 49-50). Plaintiff specifically testified that she could not perform overhead lifting, but could reach her arm to about shoulder level (Tr. 20, 29-50).

\*\*\*

Dr. Bhirud's findings of 40 degrees flexion and 50 degrees adduction were completely inconsistent with the findings of Plaintiff's treating physicians, which typically were in the range of 110 degrees to 130 degrees, and full range of motion after treatment (Tr. 299, 778, 848, 864, 866, 880, 989) (ECF No. 9).

The ALJ must address conflicting evidence. Failing to assess a claimant's capacity to perform relevant work functions despite contradictory evidence in the record is cause for remand. Although the ALJ stated the evidence supporting the RFC's lack of a limitation regarding Claimant's ability to reach in all directions, the ALJ was still required to discuss conflicting evidence. Without a discussion on conflicting evidence a reviewing court cannot determine

whether conflicting evidence was considered and therefore "frustrates meaningful review."

The ALJ in the present matter failed to discuss Dr. Bhirud's Medical Source Statement of Ability to Do Work-Related Activities stating that Claimant can never reach overhead, in all other directions and push/pull with her right hand (Tr. at 1472).  The ALJ's decision stated that Dr. Bhirud's findings, based upon her consultative examination, "identified several limitations unsupported by the record" (Tr. at 25).  Defendant asserts because the ALJ identified "only one example of Dr. Bhirud's limitations" that "it is clear from the decision on the whole that this was only one example, and the ALJ also found that Dr. Bhirud's right shoulder motion restrictions were not supported by the record" (ECF No. 9).  This explanation lacks the analysis needed for this Court to provide meaningful review pursuant to the Fourth Circuit holding in *Mascio*.

Additionally, the inability to determine if the ALJ considered conflicting evidence regarding Claimant's ability to reach in all directions with her right upper extremity, affects whether the vocational expert's testimony is based on substantial evidence.  The vocational expert (VE) testified regarding an individual's ability to perform work based upon hypothetical questions posed by the ALJ.  The ALJ's hypothetical question did not contain a limitation on an individual's inability to reach in all directions with his/her right upper extremity.  The ALJ's hypothetical question to the VE posed "no overhead reaching with the right dominant extremity" (Tr. at 58).  However, when Claimant's counsel asked the VE to consider a hypothetical individual who was also limited to "no reaching in any direction with the right dominant hand" the VE's testimony changed.  The VE's testimony on what level of work an individual could perform changed with the one additional limitation of never reaching in all directions with the right upper extremity.  A reviewing court cannot determine whether the hypothetical questions posed to the VE included all of Claimant's functional limitations, as they needed to do in order to be useful.  "In order for a vocational expert's

opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Monroe v. Colvin*, No. 15-1098 (4th Cir. 2016) (citing *Hines v. Barnhart*, 453 F.3rd 559, 566 (4th Cir. 2006)) .

The undersigned respectfully recommends that the District Judge find that the specific analysis of certain medical records that Claimant contends support her allegations that would allow for meaningful review is lacking from the ALJ's opinion. This Court makes no recommendation as to Claimant's remaining arguments. These issues may be addressed on remand. The undersigned respectfully recommends that the presiding District Judge remand this matter for further analysis and consideration.

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the Plaintiff's Memorandum in Support of Motion for Judgment on the Pleadings (ECF No. 8) to the extent Plaintiff seeks remand, **DENY** the Defendant's Brief in Support of Defendant's Decision (ECF No. 9), **REVERSE** the final decision of the Commissioner, and **REMAND** this case for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g) and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable John T. Copenhaver, Jr.. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then ten days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.

Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Copenhaver and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

Enter:  August 25, 2016

Dwane L. Tinsley
United States Magistrate Judge